*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SYMIAN JENKINS, Personal Representative for the ESTATE OF STACEY MARIE JENKINS,

Plaintiff-Appellant,

v

ASCENSION ST. JOHN HOSPITAL, ASCENSION MICHIGAN, EMERGENCY MEDICINE SPECIALISTS, PC, and ROMAJIT ALEXANDRIA YATOOMA, MD,

Defendants-Appellees.

UNPUBLISHED
February 10, 2026
11:06 AM

No. 370174
Wayne Circuit Court
LC No. 21-012734-NH

Before: RICK, P.J., and YATES and MARIANI, JJ.

PER CURIAM.

Stacey Jenkins was taken to the emergency department of Ascension St. John Hospital (the Hospital) on February 13, 2020, because of chest pains. She stayed in the emergency department for several hours for testing and observation, but she was discharged that day and left the Hospital. Early the next morning, she died. An autopsy revealed that she suffered from severe blockage of several coronary arteries. Plaintiff, the estate of Stacey Marie Jenkins, brought this action against the Hospital as well as Ascension Michigan, Emergency Medicine Specialists, PC, and Dr. Romajit Alexandria Yatooma. The case ultimately was tried to a jury, which returned a verdict of no-cause. Plaintiff now appeals of right, asserting that the trial court erred by excluding evidence offered at trial. We affirm.

## I. FACTUAL BACKGROUND

On February 13, 2020, 38-year-old Stacey Jenkins was attending a family gathering when she and some other family members drove to the market to pick up additional food items. On the way back, Jenkins said that she was feeling strange and was having chest pain, difficulty breathing, and was "teary-eyed." Her family members drove her to the emergency department at the Hospital and left her there alone because they had to tend to food at the house. Hospital records reveal that she arrived at 3:25 p.m. with a slightly elevated heart rate and blood pressure. At 4:00 p.m., Jenkins

-1-

told a triage nurse that she was feeling dizzy and experiencing heart palpitations and chest pain, but moments later, Jenkins denied experiencing chest pain or shortness of breath to a physician's assistant. Jenkins was placed in a bed in the emergency department and was administered an EKG. The results indicated some sinus tachycardia, but not enough to establish that there was a specific problem occurring, and the results were otherwise nondiagnostic. A blood sample was taken from Jenkins at 4:06 p.m. to determine, among other things, her troponin levels,[1] which revealed a low, nondiagnostic level of less than 0.03 ng/mL. At 5:25 p.m., Jenkins commented to a treating nurse that her chest pain started at 2:25 p.m., she had a history of hypertension but she had not taken her blood pressure medication "for a long time," she had no primary care physician, and her pain was a "5 out of 10."

Dr. Romajit Yatooma examined Jenkins, who explained that she had experienced dizziness and heart palpitations that had lasted for 30 minutes, but the symptoms had not returned during the past three hours. Jenkins denied being under stress, denied experiencing any chest pain, and denied having difficulty breathing. Jenkins admitted that she was a smoker, and she asserted that she was experiencing cold symptoms such as a dry cough and sore throat, but she denied any fever or chills. Dr. Yatooma's patient note for Jenkins stated that the doctor had reviewed Jenkins's family history and found that it was "noncontributory." Dr. Yatooma testified four years later at the trial that she did not recall treating Jenkins, but if Jenkins had provided any relevant family medical history, the doctor would have recorded it in the patient note.

Dr. Yatooma ordered a chest x-ray, which revealed that Jenkins's lungs were clear and her heart was a normal size. Jenkins was administered flu and strep tests, both of which were negative. A second blood sample was taken at 7:00 p.m. to determine her troponin levels, which resulted in a low, nondiagnostic level of less than 0.03 ng/mL. Jenkins's blood samples revealed no elevated white blood cell count, no anemia, and no significant dehydration, but she was administered a liter of intravenous saline fluids. Dr. Yatooma stated that Jenkins did not meet the criteria for admission into the Hospital's clinical decision unit (CDU), which operates like a one-day admission into the Hospital where a patient can be evaluated by a cardiologist, who can then order additional testing or imaging as needed. Dr. Yatooma further testified that even if Jenkins said she was experiencing chest pains, she still presented as a low-risk patient given her test results, and Jenkins would have received the same level of care. Jenkins was discharged from the Hospital, and she left the Hospital at approximately 8:30 p.m. Jenkins was referred to a cardiologist, but that referral was not signed until ten days later on February 24, 2020.

Jenkins's family picked her up from the emergency department and took her to the family gathering. Jenkins said she was no longer feeling any pain, she ate some food, and she lay down to sleep because she was tired. Jenkins and her sister spent the night at the house. Before leaving at approximately 6:00 a.m. the next day, Jenkins's sister "poked her a little bit just to mess with her," and Jenkins responded that she was trying to sleep. But later that morning, Jenkins was found

---

[1] Testimony at trial described troponin as a biomarker that is a breakdown product of heart muscle tissue that is typically released when there is damage or injury to the heart muscle.

unresponsive.[2] Her cause of death was listed as hypertensive and arteriosclerotic cardiovascular disease. An autopsy revealed that she had a 90% blockage of the left anterior descending artery. Additionally, two other arteries—the right coronary artery and the left circumflex—had "critical" blockages with a 75% obstruction.[3]

Jenkins's estate filed suit against defendants, advancing claims of negligence and medical malpractice. The complaint alleged that if Jenkins had been admitted to the Hospital for overnight monitoring and testing, then she would have been diagnosed with coronary artery disease or acute coronary syndrome (ACS), received appropriate treatment, and likely would have survived.

Plaintiff's expert witnesses testified at trial that a patient experiencing unstable angina will often present with normal EKG results and troponin levels, and if the test results do not point to a cause for a patient's symptoms, the patient should be transferred to a CDU for more monitoring and testing. Witnesses emphasized that a patient's family medical history should be considered when determining a patient's risk level. They opined that Jenkins was an intermediate-risk patient and should have been admitted to the CDU. Specifically, Jenkins's EKG, although not presenting a "striking abnormality" and not by itself diagnostic of ACS, was nonetheless "not a normal EKG." Had Jenkins been admitted for monitoring, plaintiff's expert testified that a CT scan would have "clearly shown" the blockages, and Jenkins would have been taken "straight to the cath lab as fast as possible" where an angiogram would have been performed, and, if possible, stents would have been placed in her blocked arteries that evening with a "98 percent chance of success." Otherwise, if Jenkins required bypass surgery, that could have been performed that night or the next morning with a "greater than 95 percent chance of surviving surgery."

Expert witnesses for both sides agreed that medical studies reflect a 20-25% survivability rate for patients who experience cardiac arrest while being monitored at a hospital, but all those studies include "all-comers" regardless of age or medical condition. Nonetheless, plaintiff's expert witness testified that if Jenkins had suffered a cardiac arrest while being monitored in the Hospital, and if it "was recognized quickly enough," she "more likely than not" would have survived, while defendants' expert witnesses all claimed that Jenkins would have died. Jenkins's family members testified that high blood pressure ran in the family, and Jenkins's mother died in her 50s and had a heart condition.

Dr. Yatooma testified that the Hospital's CDU is staffed by a physician between 7:00 a.m. and 5:00 p.m., and that Jenkins was stable and did not meet the criteria for admission to the CDU.

---

[2] The people who found Jenkins were not called as witnesses at trial. No testimony was provided about who called for paramedics or how they responded, what life-saving measures were taken, or when Jenkins was pronounced dead. EMS records were admitted at trial, but they do not appear to be in either the lower court record transmitted to this Court or in the parties' appendices to their briefs on appeal.

[3] At trial, one of plaintiff's expert witnesses—a cardiologist—testified that Jenkins's heart, despite being 38 years old, resembled that of patients in their 70s or 80s. He noted that if Jenkins had been provided blood pressure medication, been discharged from the emergency department, gone home, and then resumed taking her blood pressure medication, she still would have died.

Furthermore, the type of imaging that plaintiff's expert suggested could have taken place that same day—such as a CT angiogram—is performed by interventional cardiologists in the cath lab, and Dr. Yatooma lacked the authority to admit a patient to the cath lab. The decision to admit a patient to the cath lab must be made by an interventional cardiologist. At the Hospital, the interventional cardiologists are only available by on-call after hours. They would only come to the hospital after hours if a patient was "very unstable." In addition, the cath lab is only staffed by nurses after hours and is intended for unstable patients who are having a heart attack, EKG changes, or have elevated troponin levels. Jenkins was not experiencing anything of that sort. Defendants' expert witnesses opined that, given how Jenkins presented at the emergency department, Dr. Yatooma went "above and beyond" by testing her troponin levels, and so she exceeded the standard of care. Defendants' expert cardiologist testified that nothing in Jenkins's condition would have made him return to the hospital emergently after hours. Instead, he would have ordered that Jenkins wear a heart monitor for two weeks. He addressed plaintiff's expert's hypothetical timeline of treatment Jenkins should have received, asserting that even if Jenkins had undergone additional imaging, that imaging would have occurred the next morning, with results available in the afternoon, and potential procedures performed the following day. As a result, Jenkins would have died in the meantime.

At trial, the jury returned a verdict of no-cause and determined that Dr. Yatooma was not professionally negligent in her treatment of Jenkins. Plaintiff now appeals of right.

## II. LEGAL ANALYSIS

On appeal, plaintiff contends that the trial court erred by excluding testimony about what Jenkins's HEART score might have been, Jenkins's mother's cause of death, and statements that Jenkins allegedly made. Further, plaintiff asserts that those errors cumulatively warrant reversal. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion[,]" which occurs only "when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). Significantly, an error "in the admission or the exclusion of evidence . . . is not ground for granting a new trial, [or] for setting aside a verdict, . . . unless refusal to take this action appears to the court inconsistent with substantial justice," MCR 2.613(A), and appellate courts "are reluctant to overturn a jury's verdict, particularly if there is ample evidence to justify the jury's decision . . . ." *Krohn v Sedgwick James of Mich, Inc*, 244 Mich App 289, 295; 624 NW2d 212 (2001). Using those deferential standards, we will address each of plaintiff's arguments in turn.

## A. THE HEART SCORE[4]

Plaintiff argues that the trial court erred by barring plaintiff's standard-of-care expert from opining about what she thought Jenkins's HEART score would have been, and thereby preventing plaintiff from proving that Dr. Yatooma's treatment fell below the standard of care in that respect. Dr. Yatooma did not record Jenkins's HEART score. Dr. Karen Jubanyik testified as plaintiff's

---

[4] Trial testimony established that the "HEART score" is an acronym referring to a patient's history, electrocardiogram, age, risk factors, and troponin levels. Each category receives a numerical value of either 0, 1, or 2 depending on severity, and the total score is intended to assist treating physicians in assessing a patient's overall level of risk.

standard-of-care expert witness, and on direct examination, she explained that the HEART score is a tool used to evaluate patients presenting with chest pain in broad categories of risk for major cardiac events, but she conceded that she only uses "elements of the [HEART] score" in her own practice, and she does not place a HEART score in a patient's chart. She asserted that "the original reason" for implementing the HEART score "was to decide who you can save money [on] and who you can save resources for, and not waste resources and not waste money in the health care system." But she admitted that medical studies have shown that, among physicians who used the HEART score, there was disagreement over how to determine the numerical value in each of the categories, particularly with regard to "how many points to give a history and how many points to give the EKG, because there was a lot of uncertainty about what EKG changes constitute" which numerical score.[5] Plaintiff asked whether Dr. Jubanyik had calculated Jenkins's HEART score, to which defendants objected on the basis of relevance because Dr. Jubanyik essentially testified that the HEART score was not part of the standard of care, and there was no evidence that Dr. Yatooma calculated Jenkins's HEART score. The trial court questioned plaintiff about the relevance of the HEART score, since Dr. Jubanyik herself only used parts of the HEART score. Plaintiff responded that the HEART score is relevant "when we're talking about competing opinions of experts." The trial court sustained defendants' objection. Later, on cross-examination, Dr. Jubanyik reiterated that the HEART score is not required to meet the standard of care.

Evidence must be relevant to be admissible. MRE 402. Relevant evidence means evidence having any tendency to make a fact that is of consequence in determining the action more probable or less probable than it would be without the evidence. MRE 401. As this Court has noted:

> Relevance divides into two components: materiality and probative value. Material evidence relates to a fact of consequence to the action. A material fact need not be an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy. Materiality looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial. [*Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28 (2011) (quotation marks and citations omitted, alteration incorporated).]

Dr. Jubanyik clearly stated that the HEART score was a tool available to treating physicians, but the use of it is not even part of the standard of care when examining a patient complaining of chest pain. Plaintiff's contention that the trial court's exclusion of Jenkins's hypothetical HEART score took away a theory of how Dr. Yatooma's treatment fell below the standard of care is misplaced. Because the calculation of Jenkins's HEART score was immaterial to whether Dr. Yatooma's care constituted medical malpractice, the trial court did not commit an abuse of discretion by excluding testimony about the HEART score.

---

[5] Defendants presented expert testimony that studies have revealed that the HEART score tends to designate more patients as low risk than experienced emergency physicians who rely on their "gut feeling."

## B. JENKINS'S MOTHER'S CAUSE OF DEATH

Plaintiff faults the trial court for excluding as hearsay any testimony from Jenkins's family members that Jenkins's mother died of a heart attack in her 50s. Plaintiff contends such testimony would not constitute hearsay because it was not offered for the truth of the matter asserted, it would otherwise have been admissible under MRE 803(19) over any hearsay objection, and its exclusion precluded plaintiff from rebutting Dr. Yatooma's patient notes, which detailed that she reviewed Jenkins's family medical history with her and found it to be "noncontributory."[6]

During the trial, Jenkins's son, Symian Jenkins, was asked on direct examination about the circumstances of his grandmother's death. Defendants objected on the basis of hearsay. Plaintiff replied that it was not hearsay because it was not offered for the truth of the matter asserted. The trial court sustained the objection, determining that Symian could only testify based on his personal knowledge, observing that Jenkins's family's medical history was "definitely pertinent to what the issues are in this case," and invoking the rule against hearsay. The trial court alternatively decided that if Jenkins's mother's cause of death was not being offered for the truth of the matter asserted, then it was inadmissible because it was irrelevant. Plaintiff later moved for reconsideration, citing MRE 803(19) as an applicable exception to the hearsay rule. Defendants responded that precedent precludes laypersons from testifying about medical diagnoses such as the cause of death, and that MRE 803(19) applies only to testimony that a blood relative died, not about their cause of death. The trial court agreed that MRE 803(19) does not pertain to a cause of death and ruled that Symian Jenkins could testify, in his capacity as a layperson, that his grandmother "died of a heart problem," but anything beyond that would exceed a layperson's knowledge.

Symian Jenkins testified that his grandmother died in her 50s and that she was overweight. Jenkins's sister, Tanya Jenkins, testified that she and Jenkins both had high blood pressure, which runs in the family, and that their mother died at age 54 and had heart issues.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[,]" *Airgas Specialty Products v Mich Occupational Safety and Health Admin*, 338 Mich App 482, 515; 980 NW2d 530 (2021) (quotation marks and citation omitted), and is inadmissible as provided under MRE 802. Exceptions to the rule against hearsay are contained in MRE 803, including MRE 803(19), which allows for the admission of testimony about "[a] reputation among a person's family by blood . . . concerning the person's . . . death . . . or similar facts of personal or family history."

There appears to be no binding precedent in Michigan interpreting MRE 803(19) and ruling on whether it applies to a family member's cause of death, or merely to the fact that a blood relative has died. But under MRE 803(19)'s federal analogue, FRE 803(19), "[s]tatements are sufficiently trustworthy, and thus satisfy this exception, when the topic is such that the facts are likely to have

---

[6] We note that, at trial and before this Court, plaintiff presumes that Jenkins disclosed the cause of her mother's death to Dr. Yatooma. However, no record evidence supports that presumption. If Jenkins did not disclose the cause of her mother's death in her recitation of family medical history to Dr. Yatooma, then her mother's cause of death is irrelevant to the determination of whether Dr. Yatooma operated within the standard of care in treating Jenkins.

been inquired about and that persons having *personal knowledge* have disclosed facts which have thus been discussed in the community." *Porter v Quarantillo*, 722 F3d 94, 99 (CA 2, 2013). While it remains uncertain whether FRE 803(19) applies to the cause of death or only the mere fact that someone has died, there can be no doubt that people having "personal knowledge" of those facts must have been the source of the family history discussed in the testimony, so that threshold must govern the applicability of MRE 803(19).

As a threshold matter, we note a flaw in plaintiff's argument: if testimony about Jenkins's mother's cause of death was not offered for the truth of the matter asserted, how, under the facts of this case, can its exclusion by the trial court nonetheless have affected the outcome of the trial to a degree sufficient to warrant reversal? Plaintiff cannot have it both ways. If testimony about Jenkins's mother's cause of death was not offered for the truth of the matter asserted, we do not see how its exclusion would be a ground for reversal in this case. MCR 2.613(A). If it was offered for the truth of the matter asserted, then it was inadmissible hearsay unless some exception to the hearsay rule could apply. Plaintiff cites MRE 803(19) as an applicable exception, but it was neither asserted at trial nor argued to this Court that any of the lay witnesses had personal knowledge of Jenkins's mother's cause of death, or even that they learned her cause of death from anyone who had personal knowledge. Therefore, lacking that personal knowledge of Jenkins's mother's cause of death, the exception in MRE 803(19) is not applicable. Moreover, the jurors heard sufficient testimony about Jenkins's mother's health by virtue of the trial court's narrowly tailored ruling on the evidentiary issue, which neither constituted an abuse of discretion nor "appears to [this Court to be] inconsistent with substantial justice." MCR 2.613(A).

## C. JENKINS'S STATEMENTS ABOUT CHEST PAIN

Plaintiff argues that the trial court erred by excluding testimony about Jenkins's statements that she was experiencing chest pain. The trial court ruled that those statements were inadmissible hearsay, but plaintiff contends that the testimony was admissible under MRE 803(3). Defendants concede that in "the heat of trial" a hearsay objection was made during Tanya Jenkins's testimony, and the trial court erroneously sustained that objection, but the trial court's ruling caused no harm because Jenkins's statements about chest pain were presented to the jury through numerous other witnesses.

Plaintiff's claim of error is supported by only one example. When Tanya Jenkins testified, she said that they "[r]ushed her [sister] to the hospital because she was complaining of chest pain." Jenkins's statements about experiencing chest pain had already been presented to the jury through testimony from other witnesses. Defendants nonetheless objected on the basis of hearsay, and the trial court sustained that objection. Additional witnesses subsequently testified that Jenkins stated that she was experiencing chest pain. Under MRE 803(3), an exception to the hearsay rule exits for "[a] statement of the declarant's then-existing . . . physical condition . . ., but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Jenkins's statement about her chest pain satisfies MRE 803(3)'s exception to the hearsay rule, so the trial court abused its discretion when it excluded Tanya Jenkins's testimony about it. A correct decision overruling the hearsay objection would not have changed the result of the trial, however, because witnesses other than Tanya Jenkins testified about Jenkins's claim of chest pain. Thus, plaintiff is not entitled to relief on the basis of the trial court's one abuse of discretion. *Krohn*, 244 Mich App at 295.

## D. CUMULATIVE ERROR

Plaintiff insists not only that each error raised before this Court is independently sufficient to warrant reversal, but also that the cumulative effect of the three errors denied plaintiff's ability to present crucial evidence to the jury, which was outcome-determinative. "In order for cumulative evidentiary error to mandate reversal, consequential errors must result in substantial prejudice that denies the aggrieved party a fair trial," but there can be no cumulative error if there are no errors, and therefore "actual errors must combine to cause substantial prejudice to the aggrieved party so that failing to reverse would deny the party substantial justice." *Lewis v LeGrow*, 258 Mich App 175, 200-201; 670 NW2d 675 (2003) (citations omitted). Plaintiff has identified one meritorious claim of error before this Court, but that claimed error falls well short of having caused substantial prejudice to such a degree that it deprived plaintiff of a fair trial. Therefore, plaintiff is not entitled to relief on the basis of cumulative error.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher P. Yates
/s/ Philip P. Mariani